

**IN THE**
**TENTH COURT OF APPEALS**

_____

**No. 10-12-00470-CV**
**No. 10-12-00471-CV**

**IN THE INTEREST OF**
**S.W., C.H., P.W., AND A.I., CHILDREN**
**AND**
**IN THE INTEREST OF J.W., A CHILD**

_____

**From the 272nd District Court**
**Brazos County, Texas**
**Trial Court Nos. 11-001527-CV-272 and 11-001527-CVA-272**

_____

## MEMORANDUM OPINION

_____

Raising one issue with three subparts, which we will treat as three issues, Appellant J.W. (whom we will refer to with the alias Jane)[1] challenges the trial court's order of termination of her parental rights to her five children in each of these two cases.[2] Raising one issue with two subparts, which we will treat as two issues,

---

[1] *See* TEX. R. APP. P. 9.8.

[2] The five children and their approximate ages at the time of trial are S.W. (15), C.H. (14), P.W. (11), A.I. (9), and J.W. (alias Jim) (3). Because there were issues regarding the identity of Jim's father and service on him, the case as to Jim was severed. The trial court also terminated the parental rights of M.H., the father of C.H., but he has not appealed. The father of S.W. and the father of P.W. are deceased.

Appellant B.I. (whom we will refer to with the alias John) challenges the trial court's order of termination of his parental rights to A.I. in the first case. We will affirm.

After a bench trial, the trial court found the following predicate violations as grounds for termination of Jane's parental rights: (1) Jane engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being (Family Code subsection 161.001(1)(E)); (2) Jane constructively abandoned the children (Family Code subsection 161.001(1)(N)); and (3) Jane failed to comply with provisions of a court order specifically establishing actions necessary for the parent to obtain return of the children (Family Code subsection 161.001(1)(O)). The trial court found that termination of Jane's parental rights was in the children's best interest. Additionally, under Family Code section 161.003, the trial court ordered termination based on its finding that Jane has a mental or emotional illness rendering her unable to care for the children.

The trial court found the following predicate violations as grounds for termination of John's parental rights to A.I.: (1) John constructively abandoned the child (Family Code subsection 161.001(1)(N)); and (2) John failed to comply with provisions of a court order specifically establishing actions necessary for the parent to obtain return of the child (Family Code subsection 161.001(1)(O)). The trial court found that termination of John's parental rights was in A.I.'s best interest.

In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (1) of section 161.001,

termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2012); *Swate v. Swate*, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate*, 72 S.W.3d at 766. If multiple predicate violations under section 161.001(1) were found in the trial court, we will affirm based on any one ground because only one predicate violation under section 161.001(1) is necessary to a termination judgment. *In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.*, 385 S.W.3d 74, 79 (Tex. App.— Waco 2012, pet. denied). If the trial court orders termination under sections 161.001 and 161.003, we can affirm the termination under section 161.003. *See, e.g., W.C. v. Tex. Dep't Fam. & Prot. Servs.*, No. 03-12-00495-CV, 2013 WL 150292, at *1, 6 (Tex. App.—Austin Jan. 8, 2013, no pet.) (mem. op.).

We begin with Jane's second issue in each case. She asserts that the evidence is legally and factually insufficient to support the trial court's finding that she has a mental or emotional illness rendering her unable to care for the children. The standards of review for legal and factual sufficiency in termination cases are well established. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). In reviewing the legal sufficiency, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the

Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable fact-finder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

**Inability to Care for Children Because of Mental Illness**

Section 161.003(a) of the Family Code provides:

(a) The court may order termination of the parent-child relationship in a suit filed by [the Department] if the court finds that:

(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;
(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;
(3) the Department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);
(4) the Department has made reasonable efforts to return the child to the parent; and
(5) the termination is in the best interest of the child.

TEX. FAM. CODE ANN. § 161.003(a) (West 2008).

Brenda Chapman, a program director with the Department, first became

involved with Jane in November 2010 after a July 2010 incident when Jane was alleged to have whipped C.H. excessively with a cell phone cord and stomped on her face. Jane was charged with and convicted of assault-family violence and received a sixty-day sentence; she admitted to serving a thirty-day jail sentence for that conviction. The Department opened a Family Based Safety Services (FBSS) case where Jane was offered services. During the FBSS case, Jane's father had the children. Jane was referred to MHMR for a psychological evaluation, and Chapman suspected that Jane was mentally ill because of the caseworker's notes that Jane was sometimes incoherent on the phone, was sometimes delusional and was paranoid and distrustful of not just CPS but of everyone, and that Jane may have a personality disorder. Jane took and completed parenting classes but was unsuccessfully discharged from individual and family therapy. She also did not have a psychological evaluation. After a family group conference, an agreement was reached to close the FBSS case in March 2011 and for all of the children except C.H. to be returned to Jane; C.H. was living with her paternal grandmother in Kansas.

College Station Police Sergeant Leeann Alvarez, a supervisor of the Crisis Intervention Team, which deals with subjects suffering from mental illness, testified that in June of 2011, she was called to Jane's apartment because Jane had called 9-1-1 to report that someone was outside threatening her with a gun. Other officers had already arrived. Alvarez, who has special training in mental health issues, said that Jane did not "appear very well:"

She was rolling her eyes a lot. Her physical behavior. She wasn't able to communicate with us very well. It appeared that she was hearing voices. And she was making statements that didn't make any sense.

…

I could immediately tell that she was suffering from some sort of mental health issues just by the way she was behaving.

…

Her eyes were kind of glazed over. And she was very slow to respond to me. She appeared to be hearing voices because she would go into what I would describe as like a trance-like state, just kind of staring, and then looking off like she's hearing things that we're not hearing obviously.

I asked her if she was hearing voices. And she replied - - I asked her what the voices were saying. And she said they lie.

…

She kept saying things like that, that people owed her money, and that she had some chips implanted in her head, and there were some procedures that had been performed on her vocal cords.

…

She whispered from time to time. Because she believed that she had that procedure done, I guess, on her throat. So she was speaking very softly and difficult to understand at times.

And then at one point she went into a trance-like state where she just stopped all communication with us. And she closed her eyelids down so tight that all we could see was just white slits, and could not see any other portion of her eyes. It was almost like something you would see on TV. It was very disturbing. And I felt like something bad was about to happen when she did that.

As a precaution, Alvarez and the other officers handcuffed Jane, who jumped up and down and then fell to her knees. They had to carry her to a patrol car, and she was taken to MHMR and then admitted to the Austin State Hospital. Alvarez felt that Jane

was a danger to her children, and CPS was called to handle them.

Jane testified that she had not called 9-1-1 and that she and her children were outside and walking to the swimming pool when police arrived. She testified that Alvarez was not even present on that occasion and that the "whole thing was exaggerated and very false." Jane said that when the police started questioning her, she rolled her eyes at them as if to say "whatever." When asked why she thought the police took her, Jane said that the police took her and that she was put in the Austin State Hospital because "maybe [she] was just available."

Jane testified that she was at the Austin State Hospital for approximately 45 days but that she did not receive a diagnosis there. She said she had counseling and took Paxil for three days for psychosis. After being released, Jane was referred to MHMR, and she went there and was referred to a counselor whom she saw one time. Although she did not say who prescribed it, Jane said that she had been given a three-month prescription for Paxil and last took it in March 2012. Jane denied that she believed that she had chips implanted in her head and that she ever heard voices or hallucinated.

Because the police took Jane into custody in the June 2011 incident, which happened on a Friday, CPS was called and Department investigator Lynsey Wall was assigned to go to Jane's apartment to assess the situation. Jane's father was unable to take in and care for the children, and John, A.I.'s father (who lived in Dallas), said he could pick up the children, but not until Sunday. John testified that he would have gotten the children that Friday if he had known what was going to happen with them.

Because John's history with the Department required a home study before the

Department would let him take possession of the children, Wall said the Department decided to take emergency custody of the children and to place them in foster care. The Department was appointed temporary managing conservator of the children on June 13, 2011.

Department caseworker Roxanne Smart testified that Jane was provided a service plan in August 2011, after she had gotten out of the Austin State Hospital. It was explained to Jane that she would have to comply with her service plan to avoid restriction or termination of her parental rights; Jane said that Smart told her that the service plan was voluntary. Smart said that Jane was to maintain employment and have legitimate income, to have a safe home environment, to address domestic violence in therapy, and to treat her mental health issues. The Department felt that without completing these services, Jane would not be able to provide a safe environment for the children and meet all of their needs. Jane testified that she does not think the Department made reasonable efforts to return the children to her.

Smart said that in November 2011, the Department stopped Jane's monitored visits with the children because of Jane's bizarre behavior during the visits that upset the children:

> She [Jane] would speak to herself. She would hold her ear and her nose at the same time and speak to herself as if she was recording something. She would pause for long periods of time and kind of roll her eyes back as if she was listening for the questions. And then she would ask the children specific questions as if she was hearing someone giving her questions to ask.

In response, Jane said that putting her finger in her ear may have been "I can't

hear you," and holding her nose may have been "who's stinky or something like that."

Jane was told that her visits would be postponed until she got a psychological evaluation or went to MHMR for an assessment to get her further help so that the visits could recommence. Jane never went to MHMR, and she underwent a psychological evaluation with Dr. James Shinder, a psychologist, on October 22, 2012, about five weeks before trial. Jane's last visit with the children was in November 2011.

Smart testified that Jane did not comply with her service plan, though she did see two therapists several times and eventually had the psychological evaluation with Dr. Shinder. According to Smart, Jane moved from her apartment to live with her father in Bryan, and then she moved to Dallas, to Washington, D.C., and then to Kansas. At the time of trial, Jane was living in Kansas, having moved there in August 2012. Jane said that she had gotten a job selling magazines door-to-door in June 2012 and that she had been in Ohio, Illinois, and Washington D.C. for thirty days each. Smart said that she did not have constant contact with Jane because of her moving around and her changing her telephone number several times.

Dr. Shinder said that Jane was for the most part cooperative during the diagnostic interview but was very selective in her answers. Jane told Dr. Shinder that her children were brought into the Department's care because of a "vicious call" from relatives who were trying to prevent her from receiving her inheritance and to gain access to Jane's potential earnings as a songwriter and an inventor. Jane allowed Dr. Shinder to make a copy of a report from the Austin State Hospital that allegedly showed that Jane did not have a mental disorder. The report "deferred" a diagnosis or

condition on Axis I, and when Dr. Shinder tried to explain what that meant to Jane, she was not receptive to allowing him to explain it.

Based on his testing and evaluation, Dr. Shinder concluded that Jane suffers from mental illness. He diagnosed her with anxiety, depressive, and psychotic disorders. In his report, which was admitted as evidence, he states that Jane's children reported to CPS that their mother has experienced mental health issues for a long time and that they have witnessed her eating grass and talking to voices in her head.

Dr. Shinder said that Jane's "problem behavior inventory test" revealed that she is not willing to acknowledge her problems; "she doesn't see herself as having any problems." The "aggression questionnaire" indicated that Jane would have great difficulty maintaining normal relationships, and the "adult manifest anxiety scale" showed that she has major problems with anxiety. Dr. Shinder also administered four tests strongly indicating that Jane: (1) considers herself more virtuous than 99% of her peers; (2) would not take responsibility for her own actions and would attempt to justify her own misbehavior by blaming others; (3) clearly lacks empathetic and sympathetic capacity; and (4) does not have the capacity to attach and bond to others. Her MMPI test reflected hypomania and schizophrenia scales that supported Dr. Shinder's psychosis diagnosis, and it also indicated "a lot of deception."

Dr. Shinder concluded that Jane is not capable of parenting a child, that her mental or emotional illness makes Jane unable to provide for her children's physical, emotional, and mental needs, and that her deficiency or illness in all reasonable probability will continue to make her unable to provide for her children's needs for the

rest of their childhoods.

When asked if she thought she had a mental illness, Jane said that she would consider Dr. Shinder's opinion and would follow up on his recommendations for the sake of her children. She admitted to having had what she called "normal postpartum depression" after her pregnancies, which she said was temporary and not a "long-term condition." She also admitted to having "episodes" for which she would "go in for help."

John testified that Jane's mental health issues were "news" to him and that he had "been in the picture" for about ten years. He listened to Dr. Shinder's testimony and he did not believe it and disagreed with it. He was comfortable with Jane taking care of A.I. "right now"—at the time of trial.

Regarding the trial court's termination under section 161.003(a), the third element—that the Department had managing conservatorship of the children for at least six months before the termination hearing—is not in dispute. In her brief, on the first and second elements of section 161.003(a), Jane asserts only that she "hotly contested" at trial the contention that she has a mental or emotional illness rendering her unable to provide for the children's needs until their 18th birthdays, and then she also notes her testimony that she would consider Dr. Shinder's opinion and would follow up on his recommendations.

For Jane's legal sufficiency complaint on the first, second, and fourth elements of section 161.003(a), and viewing all the evidence in the light most favorable to the trial court's finding, we hold that a reasonable factfinder could have formed a firm belief or

conviction on those three elements. For her factual sufficiency complaint on those three elements, after considering the disputed evidence offered by Jane, we hold that a reasonable factfinder could have formed a firm belief or conviction on those three elements. Accordingly, the evidence is legally and factually sufficient on the first four elements of section 161.003(a). We will review the best-interest element below.

**Noncompliance with Service Plan**

In his first issue, John asserts that the evidence is legally and factually insufficient to support the trial court's finding that he failed to comply with provisions of a court order specifically establishing actions necessary for the parent to obtain return of the child and to support the trial court's finding that John constructively abandoned the child.

The trial court's June 29, 2011 "temporary order following adversary hearing" ordered John "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." John's service plan required him to complete a psycho-social evaluation, anger-management classes, parenting classes, and individual counseling with a focus on domestic violence, to participate in supervised visitation with his child A.I., to obtain or maintain employment, and to obtain and maintain a safe and appropriate home. Smart testified that anger management and domestic violence were important to the Department because of an allegation by Jane of domestic violence by John against her in 2004 and because of assault charges against John in 1989 and 1994. Smart said that John was given his service plan and that he agreed to comply with it. John admitted that he was

given a service plan, that he read it, that he understood it was important to his relationship with A.I., and that he agreed to participate in the "process."

Smart explained that, while she was the primary caseworker, because John lived in Dallas, he was assigned a courtesy caseworker based in Dallas to help him obtain and complete his required services. Smart testified that John did not complete his service plan. Specifically, she stated that John started but did not complete individual counseling, having last seen his counselor on May 4, 2012, and that he had completed only three hours of anger management and three of eight hours of parenting classes. John testified that he had trouble contacting his courtesy caseworker and that he set up most of his own services. Smart said that she had given John her phone numbers and email address and the courtesy caseworker's phone number and email address and that it had been very easy for her to contact the courtesy caseworker. Smart was unsure about his alleged trouble getting hold of the courtesy caseworker because she had "a stack of emails" between her, the courtesy caseworker, and John, and from John to the courtesy caseworker to Smart.

John also said that he had trouble seeing his counselor because of problems with the Department's 2054 contract with his counselor, which is the Department's contract with the counselor for the service and which allows the Department to pay the contractor. Smart said that John attended counseling in October 2011, one time in April 2012, and twice in May 2012, and she explained that because John stopped counseling and then restarted it, the 2054 contract had expired and they had to do another 2054 contract with the counselor.

John admitted that he had not completed counseling and anger management and that he had not taken a domestic violence class; he said he took nine hours of parenting classes. When asked if the services that he had completed put him in compliance with his court-ordered service plan, John said, "It's not enough." He also said that the service plan did not state how many hours he was supposed to complete for each service. He further explained, "Based on the circumstances that surround completing my sessions and the difficulties that I encountered with CPS, I think that I've done enough."

John said that in October 2012, the month before trial, he contacted his Dallas caseworker to find out what he needed to do before trial and learned that he was supposed to complete twelve hours of anger-management classes and twelve hours of parenting classes. He said that he had not been told previously that he had to take twelve hours of anger-management classes, and if he had known that, he would have done it. Smart said that those are the hours required of parents in Dallas by the Department and that the courtesy caseworker in Dallas explained the service plan requirements to John when she went over his service plan with him.

John said that while the children were in their first foster home, he called them "often" and visited every other month until April 2012, which was his last visit. John complained that the first foster parents did not have an answering machine for him to leave a message and that he had trouble reaching the children by phone, but Smart's understanding was that they had an answering machine, and John never informed Smart that he had trouble calling the children. Also, he was not allowed to call the

children when they moved to their second foster home.

Smart testified that when the children were in their first foster home beginning in June 2011, John was allowed to call and visit them anytime he wanted to, but he only made a "couple of visits" from June 2011 through April 2012 and that he did not make or schedule a visit after April 2012. Smart said that the only excuse John gave her for not visiting A.I. was car trouble. John said that he tried to schedule a May visit but it was not possible on the children's part. He said he did not visit in June or July because the children had already started moving, and he did not visit from August through November because the children had moved and it was difficult to get access to them.

To Smart's knowledge, John did not talk to A.I. on the phone between April 2012 and November 2012. Smart explained that when the children moved into their second foster home on August 28, 2012, which was intended to be a permanent placement, the new foster parents did not have a land line and they and the Department were not comfortable with John having their cell phone numbers, but the children had John's phone number and were free to call John when they wanted to. Also, with that placement change, Smart explained to John in a September email that he would have to contact her to schedule any visits because the new foster parents, who were intending to adopt the children, were not comfortable supervising John's visits and she would have to supervise the visits. Smart said that in late October or early November, a month before trial, John contacted her to get contact information for the children. Smart said that at that time she tried to schedule a visit for John with A.I. in November, but he never got back to her to confirm a date. Linda Marr, the children's CASA volunteer,

testified that she had not seen any interaction between John and A.I. in the five months before trial.

On appeal, the main thrust of John's sufficiency complaint against the trial court's subsection 161.001(1)(O) finding is that he substantially completed his service plan (that he "had almost completed every service") and that he had "horrible problems" getting in touch with Smart and with his courtesy caseworker in Dallas. As for not visiting or contacting A.I. in the seven months before trial, John argues that he called and visited A.I. before the children moved to their second foster home.

The Family Code does not provide for substantial compliance with a court-ordered service plan under subsection 161.001(1)(O), nor does subsection 161.001(1)(O) allow for excuses for failure to complete the service plan. *In re R.N.W.*, No. 10-11-00441-CV, 2012 WL 2053857, at *2 (Tex. App.—Waco June 6, 2012, no pet.) (mem. op.); *see also In re M.C.G.*, 329 S.W.3d 674, 676 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Rather, any excuse for failing to complete a court-ordered service plan goes only to the best-interest determination. *R.N.W.*, 2012 WL 2053857, at *2; *M.C.G.*, 329 S.W.3d at 675.

There was disputed evidence pertaining to John's excuses, but the evidence is undisputed that John did not complete his service plan; he admitted so at trial and also on appeal. Because the evidence is legally and factually sufficient to support the trial court's finding that John failed to comply with provisions of a court order specifically establishing actions necessary for him to obtain return of A.I., we overrule John's first issue on that finding. We need not address John's sufficiency complaint against the trial court's subsection 161.001(1)(N) finding that he constructively abandoned A.I.

In the Interest of S.W., C.H., P.W., A.I. and J.W. Page 16

## Best Interest

In Jane's third issue and in John's second issue, they assert that the evidence is legally and factually insufficient to support the trial court's findings that termination of their parental rights was in the children's best interest.

In determining the best interest of a child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.*

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't Prot. & Reg. Serv's.,* 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.,* 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

Smart said that, at the time of trial, the five children had been in the second foster home, a foster-to-adopt home, for three months, but they had known the second foster parents and had been around them for about fifteen months because the second foster

parents were relatives of the first foster parents. Molly Kier, the case manager for the child placing agency that placed the children, explained that the first foster parents were an older couple with a group home, and they had grown children, one of whom was one of the second foster parents. Kier said that because the second foster parents were heavily involved in the lives of the first foster parents, the children became bonded to the second foster parents as an "aunt and uncle." The second foster parents then expressed to Kier and Smart an interest in being a permanent placement for the children. The second foster parents completed the training to become a licensed foster home, and the children moved in with them on August 28, 2012, three months before trial. The second foster parents want to adopt all five children.

Smart saw the children monthly and had no concerns with the placement; the second foster parents were meeting the children's needs, and her and the Department's recommendation was for the children to stay with the second foster parents and to be adopted by them. She requested termination of both parents' rights and said that it was in the children's best interest. Smart said that the Department had done everything they could do to find a relative placement but were unable to find a suitable situation.

Kier testified that all of the children are doing "really well" in their new foster home, including in school and in extracurricular activities, and Jim, the youngest, was finally potty-trained, which was a huge step for him. Kier recommended termination and adoption.

*Desires of the children:* Smart testified that the children are all very bonded to each other and that she thought that separating A.I. from his siblings would be detrimental

In the Interest of S.W., C.H., P.W., A.I. and J.W. Page 18

to him. She said that A.I. had told her on several different occasions about his living with John, and he told her he wants to live with his siblings and not with John. Smart's opinion was that John had been a distant father and that there is no indication of a parent-child bond.

Kier said that the four older children want to remain with the current foster parents, and they understand that it would be permanent. Like Smart, Kier said that A.I. is very bonded to his siblings, that he likes being with them, and that he has not expressed any concern about separation from his father. He has never told her that he wanted to live with John.

John and Jane, however, said that A.I. and John had a close bond; he visited almost every day during the first three years of A.I.'s life.

Linda Marr, the CASA advocate for the children, said that she believed that termination of Jane's and John's parental rights was in the children's best interest. The older children had told her that they want to be adopted and stay in the home they are in. She said that A.I. had not spoken of John in the last six months, though he did in the beginning.

The evidence on this factor weighs in favor of the trial court's best-interest findings.

*The children's emotional and physical needs now and in the future and the emotional and physical danger to the children:* Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Willaims*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431-35 (Tex. App.—Waco

1992, no writ) ("Past is often prologue."); *see also In re V.A.,* No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage).

The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.,* 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc). The goal of establishing a stable permanent home for a child is a compelling state interest. *Dupree,* 907 S.W.2d at 87.

In addition to the prior FBSS case involving Jane's assault of C.H., Smart said that Jane had two other prior cases in 2004 and 2010 involving A.I., one of which concerned him drinking lighter fluid and ending up in intensive care at the hospital. Smart did not know if John was involved in those cases, but Jane successfully completed those cases.

Smart said that, other than the assault incident involving C.H., there was no abuse history with Jane, but she testified that Jane's mental health and instability are a safety risk to the children. As mentioned above, John said that Jane's mental illness was news to him. In obvious reference to what John may have known about it, Dr. Shinder said that an active parent in A.I.'s life would have become aware of Jane's difficulties because she had "tell-tale" signs: she was delusional and is a "highly unusual" person. Dr. Shinder would have expected John to have intervened to protect A.I. Dr. Shinder said that Jane's mental illness progressed and was long term and that an active father would have noticed the progression.

The evidence on these factors weighs in favor of the best-interest findings.

*Parental abilities and available programs:* As noted above, both parents failed to complete their service plans. *See In re W.E.C.,* 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet. (factfinder can infer from parent's failure to work programs offered by Department that parent "did not have the ability to motivate herself to seek out available resources needed … now or in the future."). Smart thought that, in the month before trial, John was trying to get everything marked off his list as trial was approaching, and she wished he had been more passionate about it from the beginning. As noted above, Jane did not seek the mental health treatment that was part of her service plan.

Evidence of a parent's home and job instability can show a lack of parental abilities. *Doe v. Brazoria Cty. Child Prot. Serv's.,* 226 S.W.3d 563, 574 (Tex. App.—Houston [1st Dist.] 2007, no pet.). As discussed above, during the pendency of the case, according to Smart, Jane moved from her apartment to live with her father in Bryan, and then she moved to Dallas, to Washington, D.C., and then to Kansas. Jane said that she had gotten a job selling magazines door-to-door in June 2012 and that she had been in Ohio, Illinois, and Washington D.C. for thirty days each. At the time of trial, Jane was living in Kansas, having moved there in August 2012. Jane said that she worked for a wireless company and that she was currently on leave, but her job was up for another person. She then said that she was employed by a temporary agency.

John has a used-car business and owns a couple of taxicabs, one of which John drives. He said that he had supported A.I. in the past and would continue to do so.

Lynsey Wall, the initial investigator, testified that she went through the apartment after Jane had been taken into custody. She observed that the apartment was cluttered and unkempt, Jim did not have a crib, which was a safety hazard, and there were dirty dishes in the sink. C.H. and P.W.'s bed did not appear to have been slept in and there were items covering the floor. S.W. and A.I.'s room had beds with only a sheet, and there were no clothes in the closet. In Jane's bedroom, a blanket and pillows were on the floor, all of the clothes in the closet were on the closet floor, and there was a dirty diaper on the floor. Wall said that the children told her that they all slept on the floor in Jane's bedroom because that is where the television was located.

Jane explained that they had recently returned from the laundromat and that was why the clothes were not put up. She said that the apartment was not cluttered and there was not a dirty diaper on the floor.

John said that Jane is a good mother, as evidenced by how well the children had done in school. They were well fed and had good clothes. He said that he may be comfortable for Jane to take care of A.I. He added that if Jane needs medical help for her problem, she should get it but that the children need to stay with their parents.

Malcom, the father of C.H., testified over the phone from a Kansas prison. He said that, in the late 1990's, when C.H. was born and he was around Jane, he had an opportunity to see Jane parent her children and that she was a good mother and he had no concerns about her ability to parent.

Jane considered her actions at issue in the case to be acceptable. Jane said that John had been a large factor in A.I.'s life and that he is an "acceptable" father.

The evidence on these factors weighs in favor of the best-interest findings.

*Plans for child and stability of the home:* The Department's plan was for the children to remain in their second foster home and to all be adopted together.

Jane said that she had her own home in Kansas, and when asked for the address, she answered that her mom could give it and that they could call her. Jane said it was a "normal-sized home." Jane wanted to take all of the children to live with her in Kansas.

John testified that he lives in an apartment with a den and a bedroom; if A.I. lived with him, A.I. would have his own bedroom. John testified that he would take A.I. and the other four children, who were not his biological children, as the older ones had lived with him and Jane when A.I. was young. Smart testified that, because John had not completed his service plan, had ceased contact with A.I., and had a criminal history (two assault charges, and charges for public lewdness and indecency), the Department did not conduct a home study for him. Also, she said that John never arranged for his courtesy caseworker to visit him in his home; according to the courtesy caseworker, she tried to contact John to do that and he never responded. John disagreed, stating that he asked on "numerous occasions" for a home visit.

The evidence on these factors weighs in favor of the best-interest findings.

*Acts or omissions and any excuses for them:* We have thoroughly detailed Jane's and John's acts and omissions. As for Jane, her mental illness explains her acts and omissions, but she would not seek treatment and the trial court could have reasonably concluded that termination of her parental rights was in the children's best interest.

While John was not the offending parent whose conduct caused the children's

removal, he nevertheless failed to complete his service plan. As set forth above, John offered excuses for why he did not complete his service plan and why he stopped contacting and visiting A.I. Smart disputed much of John's excuses, and the trial court was free to believe Smart over John.

The evidence on these factors weighs in favor of the best-interest findings.

*Conclusion*: Viewing all the evidence in the light most favorable to the trial court's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. For Jane's and John's factual sufficiency complaints on best interest, after considering the disputed evidence, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. The evidence is legally and factually sufficient to support the trial court's best-interest findings.

We overrule Jane's third issue in both cases and John's second issue, and we affirm the trial court's termination orders in each case.


REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed
Opinion delivered and filed September 19, 2013
[CV06]